UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                - against -

TRAVIS ZIMMERMAN,

                Defendant.

-----------------------------------------------------------X

**MEMORANDUM AND ORDER**
19-CR-414 (RRM)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

Defendant Travis Zimmerman is charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Zimmerman now moves to suppress a firearm recovered from the fuse compartment of the vehicle he was driving when he was arrested, arguing that the police improperly impounded the vehicle and that their search of the fuse compartment exceeded the scope of a lawful inventory search.  He further moves to suppress post-arrest statements elicited during questioning in which he admitted to possessing the firearm, arguing that they were coerced.  (Suppression Mot. (Doc. No. 16).)  For the reasons set forth below, Zimmerman's motion to suppress is denied in its entirety.

I.      **Background**

The following facts are uncontroverted.  In the early morning hours of August 18, 2019, two New York Police Department ("NYPD") officers were patrolling in an unmarked vehicle in the vicinity of Buffalo Avenue and East New York Avenue in Brooklyn, New York.  (Compl. (Doc. No. 1) at 2; Opp. Mem. (Doc. No. 17), Ex. A.; Decl. (Doc. No. 16-1) at 1.)  At approximately 12:52 a.m., the officers observed a red Nissan Altima ("Altima") without its headlights on.  (Decl. at 1.)  They followed, and further observed the vehicle make an illegal U-turn on Buffalo Avenue and drive through a stop sign to turn right onto East New York Avenue.

(Compl. at 2.)  The officers activated their lights and pulled over the Altima.  (Decl. at 1.) Zimmerman was the driver and sole occupant of the car.

Both officers were wearing body-worn cameras, and the ensuing encounter was recorded. (Opp. Mem. (Doc. No. 17), Ex. A and B.)  As one of the officers approached the driver's-side door, he smelled a strong odor of marijuana.  (Opp. Mem., Ex. A. at 1:32.)  The officer explained to Zimmerman the reason he was stopped.  (Ex. A at 1:04–1:11.)  Zimmerman admitted that he was driving with his lights off, and indicated that he only had a learner's permit and did not have a license, which the officers confirmed with a records check.  (Decl. at 1–2.)  Zimmerman also admitted to having marijuana and knives in the vehicle.  (Ex. A at 1:30–1:43.)

Zimmerman was told to step out of the vehicle, and one of the officers conducted a brief search of vehicle, recovering two knives and a zip-lock bag of marijuana, along with a credit card.  (Id. at 2:20–4:30.)  Zimmerman was placed in handcuffs.  (Ex. A at 1:42.)  One of the officers asked defendant if the car belonged to him, and Zimmerman replied that it did.  (Opp. Mem., Ex. A. at 10:00.)  The vehicle was impounded and brought back to the 77th Precinct. (Decl. at 2.)  Zimmerman was brought there as well.

At the precinct, at approximately 1:28 a.m., the officers, along with a supervisor, conducted an inventory search of the Altima.  (Decl. at 2.)  During the search, the officers recovered a loaded 9 mm Kurz .380 caliber semi-automatic pistol with serial number N 05598 ("firearm") from the fuse compartment located at the lower left of the steering wheel, as well as a large quantity of cash.  (Decl. at 2.)   The officer opened the unlocked fuse compartment using its readily-available handle, without any tools and with "little to no effort."  (Opp. Memo. at 15; Ex. D at 1:03–1:10.)  The officer had already searched the vehicle's center console; there was no glove compartment in the car.  (Opp. Mem. (Doc. No. 17), Ex. D. at 0:44–0:59.)

2

At approximately 11:05 the next morning, one of the arresting officers and a detective interviewed Zimmerman.  The interview was recorded on video, and a transcript prepared. (Opp. Memo. Ex. E; *see also* Tr. (Doc. No. 23-2).)  At approximately 11:06 a.m., Zimmerman was read his *Miranda* rights and he waived them.  (Tr. at 3–4.)  At approximately 11:09 a.m., Zimmerman admitted that the car was registered in his girlfriend's name but that he is the one who mostly uses it.  (*Id*. at 6.)  At 11:10 a.m., the detective told Zimmerman that the police had found a firearm in the vehicle, and asked Zimmerman whether he wanted to "elaborate" on it.  (*Id*. at 7.) Zimmerman initially responded that he did not.  (*Id*.)  The detective then stated:

> Since that car's under your girlfriend's name, you understand she's going to get arrested and charged for it, right?  So now, the question comes to where if it's yours, this is the opportunity and time that you have to say, yeah that's mine.  Ok?  Now, if we go back, that firearm right now is being dusted and tested for DNA. All right?  Now, if it comes back to you, then we're going to have to come back here again and deal with it.  All right?  This is your shot, and your opportunity to be like, this is A, B, C, and D, this is the reason why I had it, this is why I did it.  All right?  It's understandable if you got beef with somebody or you were a victim of a crime earlier and you're carrying for A, X, B, and C reason, it's all good.  But if you're gonna sit here and tell me I don't know, I don't want to talk about it, then we're not doing anything.  You just making that hole bigger for you and your girlfriend, because that car is under her name.  So the ball is on your court now, brother.

(*Id*. at 7–8.)  Then, Zimmerman asked, "so the question, if I say it's mine, hypothetically speaking, does that leave her out of it?"  The detective responded,

> Well, I'm not forcing you . . . . Just hear me out. I'm not forcing you to say that that's yours.  At no point in time I said take blame for it.  Ok?  You have to understand that now.  So, it doesn't take a genius to put two and two together where a car that you mostly, 90 percent of the time that you're using and a firearm was found in it. All right? . . . Once again, I'm not here to point fingers, I'm not telling you did A, B, C and D.  None of that, ok?  We're human beings, excuse my language, shit happens, all right? . . . Now, I don't know what's going on in your life.  I'm not here to judge

3

> you.  People, different people got different walks of, of life.  They
> got different shit going on with their jobs, their personal life.
> That's on you.  I'm not here to judge you.  Now, what I do need is
> a reason why you had it and how it got to that car, all right?  So, go
> ahead now.

(*Id*. at 8–9.)  At that point, Zimmerman responded, "I work for the projects and I had it for

protection."  (*Id*. at 9.)  The defendant stated that the gun was a .380, black in color, and that he

found it three or four months ago.  (*Id*.)

## II.   Discussion

Zimmerman argues that his Fourth Amendment rights were violated because the police

officers unlawfully impounded his vehicle and seized evidence from it through an unlawful

inventory search.  He also argues that his Fifth Amendment rights were violated because he was

coerced into make incriminating statements during his interview following his arrest.

Specifically, he claims that "threats" to arrest his girlfriend rendered his statements involuntary.

For the reasons that follow, Zimmerman's motion fails in its entirety.

### A.  Procedural Issues

Before addressing the merits of the motion, the Court addresses preliminarily two

procedural issues:  Zimmerman's request for an evidentiary hearing, and his "standing" to move

to suppress.

#### 1.  Evidentiary Hearing

"A defendant moving for the suppression of evidence seized following a search is not

automatically entitled to an evidentiary hearing."  *United States v. Garcia*, No. 18-CR-178 (AT),

2018 WL 3407707, at *2 (S.D.N.Y. June 5, 2018) (quoting *United States v. Barrios*, 210 F.3d

355, at * 1 (2d Cir. 2000) (summary order)).  Instead, an evidentiary hearing on a motion for the

suppression of evidence is appropriate where a defendant "supports his motion with moving

papers that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to

conclude that contested issues of fact going to the validity of the search are in question."

*Barrios*, 210 F.3d at *1 (alteration adopted) (citation and quotation marks omitted). In other

words, a defendant is entitled to an evidentiary hearing where there is "a contested issue of

material fact." *United States v. Harun*, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017) (citation

omitted). Arguments made solely by defense counsel in motion papers "cannot by themselves

create a factual issue." *United States v. Mottley*, 130 F. App'x 508, 510 (2d Cir. 2005) (summary

order); *see also United States v. Spencer*, No. 06-CR-413 (DLI), 2016 WL 6781225, at *5

(E.D.N.Y. Nov. 15, 2016*)* ("[A] statement in an attorney's brief is insufficient to create a factual

dispute to justify a hearing." (citations omitted)). Courts in this circuit "have 'repeatedly' denied

motions to suppress without a hearing 'where defendants have failed to provide affidavits

alleging facts based on personal knowledge.'" *United States v. Perryman*, No. 12-CR-0123

(ADS), 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013) (quoting *United States v. Larranga

Lopez*, No. 05-CR-655 (SLT), 2006 WL 1307963, at *3 (E.D.N.Y. May 11, 2006)).

Here, in an effort to create contested issues of fact, Zimmerman provided only a

declaration of his attorney, and did not submit his own sworn statement. (Decl. (Doc. No. 16-1.)

Obviously, given that his attorney lacks the required personal knowledge, Zimmerman cannot

solely rely on his attorney's declaration to "explain the circumstances surrounding his arrest nor

describe[] the sequence of events that transpired that day." *United States v. Ruiz*, 94-CR-392

(LAP), 1994 WL 613294, at *4 (S.D.N.Y. Nov. 7, 1994).

Moreover, Zimmerman does not contest the initial stop of the vehicle he was driving.

And importantly, the initial encounter between the officers and Zimmerman after Zimmerman

was pulled over, as well as the preliminary search of the vehicle at the scene, were recorded on

5

two separate body cameras worn by the officers.  So, too, the inventory search of the vehicle was recorded, as was Zimmerman's interview at the precinct.  Thus, the material facts relevant to Zimmerman's motion are uncontroverted, and Zimmerman has not provided a statement or other evidence that is "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that [there are] contested issues of fact going to the validity of [the motion]."  *Barrios*, 210 F.3d at *1 (citation omitted).

### 2.  Reasonable Expectation of Privacy

A defendant seeking to have evidence suppressed must have a reasonable expectation of privacy in the location searched.  *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978).  "To mount a challenge to search of a vehicle, defendants must show, among other things, a legitimate basis for being in it, such as permission from the owner."  *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991) (citing *United States v. Ochs*, 595 F.2d 1247, 1253 (2d Cir. 1979)).

The Second Circuit has stated that "the absence of a valid license *alone* may not destroy an unauthorized driver's expectation of privacy."  *United States v. Lyle*, 919 F.3d 716, 729 (2d Cir. 2019) (emphasis added).  Here, Zimmerman submitted an affidavit from his girlfriend, Linda Davis, stating that she had given Zimmerman "permission to use the vehicle on August 17–18, 2019, the night he was arrested" and that he "generally has permission to use the vehicle."  (Aff. (Doc. No. 20) at 2.)   Furthermore, although Zimmerman did not have a valid driver's license that permitted him to be driving alone at night, he was the sole occupant of the car at the time of his arrest and had exclusive use of it.  *See United States v. Ochs*, 595 F.2d 1247, 1253 (2d Cir. 1979) (finding that the defendant had "possessory interest" in the car and the ability to exclude others from it when he had the key to the car and the permission to use it).  For

these reasons, the Court finds that Zimmerman has a sufficient expectation of privacy to seek suppression of the gun and other evidence found in the vehicle.

The Court now turns to the merits of Zimmerman's motion.

**B.  Fourth Amendment Challenge to the Seizure of the Firearm**

Zimmerman challenges the impoundment of the vehicle he was driving on the night in question, as well as the seizure of the firearm in what Zimmerman characterizes as an unlawful inventory search.  It is important to note at the outset that Zimmerman does not challenge his initial stop by the officers.  He does not dispute that the officers had probable cause to believe that he was committing traffic infractions.  *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009) ("Reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop.");  *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001) ("The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.")  Nor does he dispute the fact that the officers had probable cause to arrest him once they learned that he was driving without a valid license, had committed numerous traffic infractions in the officers' presence, and was in possession of marijuana.  *United States v. Fisher*, 702 F.2d 372, 375 (2d. Cir. 1983) (Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution that an offense has been or is being committed by the person to be arrested.)

**1.  Impoundment of the Altima**

Zimmerman claims that impounding the vehicle violated his Fourth Amendment rights. Specifically, he argues that because the officers did not check to see whether an owner of the

vehicle could take custody of it at the of arrest or before the inventory search, the impoundment was unlawful.  Zimmerman's claim is without merit.

"It is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions – an authority that is beyond reasonable challenge."  *Lyle*, 919 F.3d at 728 (citing *South Dakota v. Opperman*, 428 U.S. 364, 368–69 (1976) (internal quotations omitted)).  Officers have no obligation to contact an absent third party before impounding, or to grant a defendant's request to make arrangements to secure the vehicle.  *See Lyle*, 919 F.3d at 731 (finding that police were not required to contact the defendant's girlfriend, who was the authorized driver of the car under the car's rental agreement).  In *Lyle*, the Second Circuit looked to the totality of the circumstances and found impoundment reasonable where the defendant was the sole occupant of the vehicle, there was no third party immediately available to entrust with the vehicle's safekeeping, the officers could not ascertain how long the car would be unattended in light of the defendant's arrest, and even if released, the defendant did not possess a valid license to drive it.  *Id*.

Here, too, Zimmerman was the sole occupant of the vehicle that had been stopped at an intersection in Brooklyn in the early morning hours.  There was no third party immediately available, and the officers knew neither the length of Zimmerman's detention, nor the length of time the car would be left unattended.  Moreover, Zimmerman initially advised the officers that the car was his and did not mention his girlfriend or any other third party available to retrieve the vehicle.  He further admitted that he did not have a valid license, only a permit that did not allow him to drive the vehicle.   Under the totality of the circumstances, it was a reasonable exercise of law enforcement's "community caretaking" responsibilities to impound the Altima so that it was

not left in public for an indefinite period.  *See United States v. Mundy*, 806 F. Supp. 373, 376 (E.D.N.Y. 1992) (finding police's caretaking responsibilities "particularly important where a car would be unattended, even if legally parked, and the police have reason to believe that a suspect will be separated from his vehicle for a long period of time").

### 2.   Inventory Search of the Altima

Zimmerman also argues that the search of the fuse box was outside the scope of a lawful inventory search, and the firearm recovered therefrom must be suppressed.  This claim is also without merit.

When law enforcement officials take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without probable cause.  *United States v. Williams*, 930 F.2d 44, 53 (2d Cir. 2019) (citing *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008));  *see also Illinois v Lafayette*, 462 U.S. 640, 647 (1983) ("[A]n inventory search constitutes a well-defined exception to the warrant requirement." )  A valid inventory search is not done "to detect crime or to serve criminal prosecutions," but "for quite different reasons: (1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger."  *Lopez*, 547 F.3d at 369.  Police officers may "open closed containers as part of an inventory search so long as they act in good faith pursuant to standardized criteria or established routine."  *United States v. Morillo*, No. 08-CR-676 (NGG), 2009 WL 3254431, at *8 (E.D.N.Y. Oct. 9, 2009) (quoting *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002)).

"The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices."  *Id*. at 137.  This requirement helps "ensure that inventory searches do not become a ruse for a general rummaging in order to

discover incriminating evidence." *Lopez*, 547 F.3d at 371–72.   Nonetheless, not "every detail of search procedure must be governed by a standardized policy." *Id*. at 369.   The key question is whether such policy would "safeguard the interests protected by the Fourth Amendment." *Id*.

 "An inventory search pursuant to standardized procedures will be upheld unless there is a showing that the government acted in bad faith or searched the car for the sole purpose of the investigation." *United States v. Arango-Correa*, 851 F.2d 54, 59 (2d Cir. 1988).   However, the fact that the searching officers may have suspected that further evidence of criminal activity would be found does not alone invalidate the inventory search.  *See Untied States v. Banks*, 150 F. Supp. 2d 548, 554 (S.D.N.Y. 2001) (even if officer harbored a "hope or motive" that a vehicle trap door would reveal evidence, otherwise valid inventory search conducted pursuant to reasonable police procedures upheld); *United States v Mundo*, 806 F. Supp. 373, 376-77 (E.D.N.Y. 1992) (validity of inventory search not vitiated by police suspicion that evidence of a crime may be found).

Here, the inventory search was conducted pursuant to established procedures set forth in the NYPD Patrol Guide (Opp. Mem., Ex. F.)  The Patrol Guide directs officers to search the interior of the vehicle thoroughly, including but not limited to the glove compartment, under and behind the dashboard, in the air vents where accessible, under the hood, and in the trunk.  It counsels that an inventory search should include any area that may contain valuables.  "Any closed container may be opened and its content inventoried . . . and officers [are allowed] to force open trunk, glove compartment, etc., only if it can be done with minimal damage." *United States v. Miller*, No.  18-CR-395 (NGG), 2019 WL 2088248  at *6  (E.D.N.Y. May 13, 2019, *suppression granted on other grounds,* 439 F. Supp.3d 91 (E.D.N.Y. 2020).

10

The firearm here was recovered from the Altima's fuse box, located immediately adjacent to the driver's seat near the steering wheel.  As noted in the video footage of the inventory search and in the photos provided by the government (Opp. Mem., Ex. C) , the fuse box is a plastic compartment within reach of the vehicle's driver, and designed to be opened by hand, as was easily done by the searching officer who recovered the firearm.  Though not intended for that purpose, the fuse box was large enough to hide valuables, including the firearm at issue, and an inventory search is designed to ferret out such hiding places to protect both the police and the vehicle's owner in the event property is claimed to be lost.

Zimmerman "finds suspicious" the fact that the officers searched the fuse box almost immediately after beginning the inventory search.   (Suppression Mot. (Doc. No. 16) at 4.)  The Court finds this of no moment.  First, there is no requirement that officers conduct an inventory search in any particular manner.  Moreover, the officers had already conducted a preliminary search of the interior of the vehicle at the scene, recovering two knives and marijuana from the center console, and the vehicle did not have a glove compartment.  Even if the officers, based on their experience, harbored a belief that the fuse box might contain valuables or even contraband, that alone is not sufficient to find that the officers conducted the search in bad faith.  As noted above, the vehicle was properly impounded, and the officers were entitled to conduct a thorough inventory search of any and all areas, including closed or locked compartments and containers, in which valuables or other property could be stored or secreted.  The fuse box, easily opened and readily accessible, was well within the scope of the NYPD's standard inventory search protocol as set forth in the Patrol Guide.  As such, Zimmerman's motion to suppress the firearm recovered therefrom is denied.

### C. Fifth Amendment Challenge to the Voluntariness of Zimmerman's Post-Arrest Statements

Zimmerman also claims that statements made during the course of his post-arrest interview were coerced.  It is well established that "*any* criminal trial use against a defendant of his involuntary statement is a denial of due process of law . . . ."  *Mincey v. Arizona*, 437 U.S. 385, 398 (1978).  A confession is involuntary, and therefore inadmissible, if it is obtained by "techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'"  *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (citation and internal quotation marks omitted).  In evaluating the voluntariness of confessions, the Second Circuit has employed an objective analysis which "look[s] at the totality of the circumstances in which they were given to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'"  *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987)).  Factors to consider include the suspect's "background and experience, the conditions of his interrogation and the conduct of the law enforcement officers."  *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (citing cases).  However, "[n]o single factor determines whether a confession is voluntary."  *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *United States v. Bye*, 919 F.2d 6 (2d Cir. 1990)).

In evaluating whether a confession is voluntary, courts must be mindful of a distinction between "choices which are physically or psychologically coerced and those which are merely difficult."  *United States v. Mullens*, 536 F.2d 997, 1000 (2d Cir. 1976).  "Only the former are void under our law."  *Id.*  This distinction is "often a subtle one and must depend in each instance upon an evaluation of the totality of the circumstances presented."  *Id.*  The burden is on the

12

government to prove that a confession is voluntary by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

While "no federal court has yet held that a confession or consent is involuntary solely on the ground that it was prompted by the defendant's desire to protect a relative from the rigors of arrest, interrogation and possible confinement," *Mullens*, 536 F.2d at 1000, neither the Second Circuit nor the Supreme Court has "squarely addressed whether threats to charge third-parties amount to coercion." *Lewis v. Graham*, No. 13-CV-933 (MAT), 2018 WL 3819557, at *4 (W.D.N.Y. Aug. 10, 2018); *Rodriguez v. Warden of Clinton Corr. Facility*, No. 13-CV-3505 (ERK) (LB), 2014 WL 7177894, at *5 (E.D.N.Y. Dec. 16, 2014); *see also United States v. Fable*, No. 18-CR-3 (JCH), 2018 WL 3727346, at *10 (D. Conn. July 24, 2018). However, "several . . . district courts within this circuit have held that 'such a threat does not render a confession involuntary if the police have probable cause to arrest the family member and thus could lawfully carry out the threat.'" *Rodriguez,* No. 13-CV-3505 (ERK) (LB), 2014 WL 7177894, at *5 (quoting *United States v. Ortiz*, 943 F.Supp.2d 447, 456–57 (S.D.N.Y. 2013)); *see United States v. Goins*, 157 F. Supp. 3d 148, 163 (D. Conn. 2016). Many of these district court holdings are themselves based on opinions from other circuit courts, such as *United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006), *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007); *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003); *Thompson v. Haley*, 255 F.3d 1292, 1296–97 (11th Cir. 2001); and *Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986).

Relying on these circuit and district court opinions, defendant urges the Court to adopt a *per se* rule that threats to arrest loved ones and family members, absent probable cause, "are so coercive, especially in the context of an inherently coercive custodial interrogation, that

statements [made in response to those threats] are rendered involuntary regardless of the other circumstances." (Supplemental Sur-reply (Doc. No. 30) at 2.)  The Court declines to do so.

First, as the government correctly points out, the *per se* rule defendant advocates is not supported by the cases on which he relies.  Those circuit and district court opinions support the proposition that a threat to arrest a beloved third-party does not render a confession involuntary if the police have probable cause to arrest that person and thus could lawfully carry out the threat.  *See Rodriguez*, 2014 WL 7177894, at *5; *Ortiz*, 943 F.Supp.2d at 456–57; *Goins*, 157 F. Supp. 3d at 163.  They do not support the proposition that a threat to arrest a beloved third-party alone renders a confession involuntary if the police do not have probable cause.  To be sure, "[c]ourts in this district have held that a police threat to arrest a suspect's loved ones *undermines* . . . voluntariness . . . where the police lack probable cause to make such arrests." *United States v. Munoz*, 987 F. Supp. 2d 438, 447 (S.D.N.Y. 2013) (emphasis added).  However, neither *Munoz* nor any of the cases cited by defendant hold that the existence or absence of probable cause is determinative.

Second, adoption of this *per se* rule would supplant the "totality of the circumstances" approach in instances in which a suspect was threatened with the arrest of a loved one. Defendant himself admits that under the approach he advocates, "the totality test collapses into [a] probable cause inquiry" whenever "there is in fact third party threat made during a custodial interrogation." (Supplemental Sur-reply at 2.)  As such, the *per se* rule is antithetical to the Second Circuit's ruling that "[t]here are not two rules—standing as twin lighthouses—to guide a reviewing court safely to harbor in determining whether a confession is voluntary.  There is only one guide—the totality of the circumstances rule." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988).

Third, a singular focus on whether probable cause exists or not is inconsistent with the rationale of this line of cases.  As Judge Korman has noted:

> [I]t is unclear … why the voluntariness of the confession should be affected by whether law enforcement officers had sufficient basis to arrest or charge a third person. In either case, the effect on the interrogated suspect would be the same, even if law enforcement officers did not intend to arrest or charge the third person.  *See Miller*, 450 F.3d at 273 ("a modicum of trickery is tolerable during criminal investigations").

*Rodriguez*, 2014 WL 7177894, at *5.  Rather, the logic underlying this line of cases appears to turn on whether the police have an honest basis for the threat or not.  "Where the police have an honest basis for their statement, it is not coercive to make it.  But false threats made in order to obtain consent deprive the suspect of a free and informed choice based on the realities before him."  *Munoz*, 987 F. Supp. 2d at 447.

*Miller*, the Seventh Circuit case cited by Judge Korman, provides an expansive and persuasive explanation of the rationale.  In that case, the police threatened, during custodial interview at a stationhouse, "to arrest [Miller] and his girlfriend if he asked for an attorney or exercised his right to remain silent."  *Miller*, 450 F.3d at 272.  The district court ruled that this threat made Miller's subsequent decision to cooperate with the police involuntary.  The Seventh Circuit reversed; the Court's reasoning is instructive:

> The police offered Miller a way to retain his freedom: come clean and cooperate in the investigation of his suppliers and customers. If Miller chose silence plus counsel, implying an adversarial stance—as the police told him he had every right to do—the natural consequence was immediate custody and prosecution for Miller and his girlfriend. … A choice between cooperation and freedom, on the one hand, and silence followed by custody and prosecution, on the other, is a common one. This is the real choice many suspects face whether or not the police lay it out in so many words; clear articulation of the options makes a choice better informed and thus more rather than less voluntary. … Suspects are not entitled to full information, *see Ohio v. Robinette*, 519 U.S. 33, 117 S. Ct. 417, 136 L.Ed.2d 347 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973), but can't complain when they get it and learn that some of the options are unpalatable.

15

An objectively unwarranted threat to arrest or hold a suspect's paramour, spouse, or relative without probable cause could be the sort of overbearing conduct that society discourages by excluding the resultant statements. *See Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (which we understood in *Johnson* to demonstrate that hostage-taking is unduly coercive). But a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates differs from taking hostages. …

Requiring the police to keep their plans secret could not help suspects: if Miller had been unable to make a deal by offering information and cooperation, then both adult occupants of the place where the drugs and guns were found could have been arrested [ ]…; It would be unthinkable to have a legal rule requiring the police to say, in response to a suspect's inquiry: "We are forbidden to tell you what will happen to you, your girlfriend, and your child if you decline to cooperate."

450 F.3d at 272–73.

Although the police in *Miller* had probable cause to arrest both Miller and his girlfriend, the *Miller* Court made it clear that this rationale did not require that the police lay out the suspect's options with legalistic precision. After noting that Miller had not provided "any reason to doubt that the police accurately stated what they would do if he clammed up" and did not "deny that the Constitution would have allowed them to carry out that plan, for they had probable cause to arrest both Miller and his girlfriend," the Court added:

This is not to say that candor always is essential; a modicum of trickery is tolerable during criminal investigations. *See United States v. Ceballos*, 302 F.3d 679, 694–95 (7th Cir.2002); *Holland v. McGinnis*, 963 F.2d 1044, 1055 (7th Cir. 1992); *United States v. Rutledge*, 900 F.2d 1127, 1130–31 (7th Cir. 1990). How far agents may go to mislead is not in question here, however, for they told Miller the (unwelcome) truth.

*Miller*, 450 F.3d at 273.

Like the Seventh Circuit, the Second Circuit has endorsed the view that there is nothing improperly coercive in explaining to a suspect the benefits of cooperating or making a statement. The Second Circuit has stated that once a suspect has been advised of his rights, the police are

16

"free to discuss with him the evidence against him and the reasons why he should cooperate." *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989), *cert. denied*, 493 U.S. 1082 (1990). Statements conveying the benefits of cooperation are "not improperly coercive" but, rather, "common sense factual observations." *United States v. Ruggles*, 70 F.3d 262, 265 (1995). In *Ruggles*, the Second Circuit implied that those statements need not be entirely accurate, stating: "Material misrepresentations based on unfulfillable or other improper promises *might perhaps* overbear a defendant's will." *Id.* (emphasis added).

In this case, a careful examination of the totality of the circumstances makes it clear that Zimmerman's will was not overborne. First, as the video of the interview makes clear, Zimmerman was alert, relaxed, and engaged in a calm, responsive dialogue with his interviewers. During the interview, Zimmerman stated that he was born on April 1, 1989, (Tr. 1), making him 30 years old at the time of the interview. He stated that he had been working for the New York City Housing Authority for over a year. (Tr. 1–2.)[1] "There is no indication in this record that [he] was a newcomer to the law, mentally deficient, or unable in the face of a custodial arrest to exercise a free choice." *United States v. Watson*, 423 U.S. 411, 424–25 (1976).

With respect to the conditions of the interview, there is no indication of undue coercion. Although Zimmerman had been in custody for almost ten hours before he was interrogated, there is no suggestion that he was deprived of sleep, food, or drink during that period. Indeed, it is clear that the police provided him with at least one cigarette prior to or during the interview. (Tr.

---

[1] While not critical to the analysis, the Court will take judicial notice of the fact that, at the time of his interview, Zimmerman had some experience with the criminal justice system. In 2008, at age 19, he was arrested and indicted for attempted robbery in the second degree, assault in the second degree, and other, lesser offenses. He pled guilty to a single count of attempted robbery in the second degree and was sentenced to one year of imprisonment and five years of supervised release.

1.)  Zimmerman was not handcuffed during the interview, which was conducted in the stationhouse by Detective Camacho, who was accompanied by one of the arresting officers.

These officers did not conduct themselves in such a way "as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined." *Kaba*, 999 F.2d at 51.  The arresting officer read Zimmerman his *Miranda* rights, and Zimmerman agreed to speak with the officers.  (Tr. 2–3.)  The detective then questioned him about the car that Zimmerman had been driving at the time of arrest and established that the car was jointly owned by Zimmerman and his girlfriend.  (Tr. 4.)  He also established that the girlfriend sometimes used the vehicle, even though Zimmerman used it most of the time.  (Tr. 5.)

Immediately thereafter, Detective Camacho informed Zimmerman that a gun had been found in the car.  (Tr. 6.)  After stating, among other things, "[Y]ou have to understand the consequences," the detective began to list Zimmerman's offenses:  driving without a headlight, without a license, and in possession of "some knives."  (Tr. 6.)  He then asked if he wanted to "elaborate" on the fact that a gun had also been recovered from the car.  (Tr. 6.)

When Zimmerman declined, the detective sketched out the likely consequences of his failure to cooperate.   He stated:

> This is how it works.  Since that car's under your girlfriend's name, you understand she's going to get arrested and charged for it, right?  So now, the question comes to where if it's yours, this is the opportunity and time that you have to say, yeah that's mine.  Ok?  Now, if we go back, that firearm right now is being dusted and tested for DNA.  All right?  Now, if it comes back to you, then we're going to have to come back here again and deal with it.  All right?  This is your shot, and your opportunity to be like, this is A, B, C, and D, this is the reason why I had it, this is why I did it.  All right?  It's understandable if you got beef with somebody or you were a victim of a crime earlier and you're carrying for A, X, B, and C reason, it's all good.  But if you're gonna sit here and tell me I don't know, I don't want to talk about it, then we're not doing anything.  You just making that hole bigger for you and your girlfriend, because that car is under her name.  So the ball is on your court now, brother.

(Tr. 6–7).

Zimmerman then sought to clarify his options, asking "if I say it's mine, hypothetically speaking, does that leave her out of it?" (Tr. 7.) This question prompted the detective to explain:

> I'm not forcing you to say that that's yours. At no point in time I said take blame for it. Ok? You have to understand that now. So, it doesn't take a genius to put two and two together where a car that you mostly, 90 percent of the time that you're using and a firearm was found in it. All right? . . . Once again, I'm not here to point fingers, I'm not telling you did A, B, C and D. None of that, ok? We're human beings, excuse my language, shit happens, all right? . . . Now, I don't know what's going on in your life. I'm not here to judge you. People, different people got different walks of, of life. They got different shit going on with their jobs, their personal life. That's on you. I'm not here to judge you. Now, what I do need is a reason why you had it and how it got to that car, all right? So, go ahead now.

(Tr. 7–8.) In response, Zimmerman stated that he worked in "the projects," and had the gun "for protection." (Tr. 8.) Zimmerman made that confession less than eleven minutes after the interview began.

This questioning was not coercive. After Zimmerman *waived* his Miranda rights, the police were "free to discuss with him the evidence against him and the reasons why he should cooperate." *Tutino*, 883 F.2d at 1138. Detective Camacho did precisely that, stating, "you have to understand the consequences," and describing the evidence against Zimmerman. (Tr. 6.)

In this context, the statement, "you understand she's going to get arrested and charged for it, right?" appears to be less a threat than an explanation of likely future events. Zimmerman had just explained to the detective that he and his girlfriend owned and used the car. To be sure, it was likely that Zimmerman, who used the car most often and was its sole occupant that evening, owned the gun. However, absent a confession from Zimmerman, the police could not completely discount the possibility that the girlfriend owned it. Certainly the question of

19

whether these facts gave the police probable cause to arrest the girlfriend may have been close; indeed, Detective Camacho – the person who would have been assessing probable cause in the first instance – could have honestly harbored an intention to arrest her.  Thus, the overall focus of the questioning by Detective Camacho centered on key issues:  who owned the car, who used it the most, in order to determine who may be criminally liable for possessing the firearm. Accordingly, the alleged threat was not "[a]n objectively unwarranted threat to arrest or hold a suspect's paramour" and was not "the sort of overbearing conduct that society discourages by excluding the resultant statements."  *Miller*, 450 F.3d at 272.

To the extent that Zimmerman viewed the detective's comments about his girlfriend as an attempt to coerce a statement, Detective Camacho made it abundantly clear that he was not "forcing" a confession.  The detective highlighted the strength of the circumstantial cases against Zimmerman, noting that it wouldn't "take a genius" to conclude that he was responsible for a firearm found in a car he was using "90 percent of the time."  To be sure, the detective confronted Zimmerman with a "difficult" choice, and Zimmerman's decision to confess may well have been prompted by his desire to protect his girlfriend from the rigors of arrest, interview, and possible confinement.  However, these facts do not make out the sort of physical or psychological coercion that would justify a finding that Zimmerman confession was involuntary.  *See Mullens*, 536 F.2d at 1000.  Zimmerman's motion to suppress the statements made during his post-arrest interview is, therefore, denied.

**CONCLUSION**

For the reasons stated herein, Zimmerman's motion to suppress is denied in its entirety.

SO ORDERED.

Dated:  Brooklyn, New York          *Roslynn R. Mauskopf*
           August 14 , 2020

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge

21